## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL FRYE,                                 :
                                              :
                    Plaintiff                 :          No. 3:14-CV-0809
                                              :
            vs.                               :          (Judge Nealon)
                                              :
CAROLYN W. COLVIN, Acting                     :
Commissioner of Social Security,             :
                                              :
                    Defendant                 :

FILED
SCRANTON

FEB 1 8 2016

PER _____
              DEPUTY CLERK

## MEMORANDUM

On April 28, 2014, Plaintiff, Michael Frye, filed this instant appeal[1] under

42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social

Security Administration ("SSA") denying his applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and

XVI of the Social Security Act, 42 U.S.C. § 1461, et seq, and U.S.C. § 1381, et

seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the

reasons set forth below, the decision of the Commissioner denying Plaintiff's

application for DIB and SSI will be affirmed.

_____

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his application for DIB on May 12, 2009, and his application for SSI on June 5, 2009, alleging disability beginning on July 1, 2004, due "anxiety, depression and learning disability." (Tr. 282, 311, 316).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on March 12, 2010. (Tr. 124).  An initial hearing was held on February 17, 2011, before administrative law judge Daniel Myers ("ALJ"), at which Plaintiff and impartial vocational expert Cheryl Bustin testified. (Tr. 41).  On April 1, 2011, the ALJ issued a first decision denying Plaintiff's claims. (Tr. 121-123).  On July 27, 2012, the Appeals Council remanded the case to the ALJ for three reasons: (1) the decision did not articulate the weight given to the opinions of three physicians; (2) the decision did not address the evidence of the Plaintiff's mother's third party function report; and (3) the vocational expert testified that Plaintiff could not

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on January 27, 2015.  (Doc. 11).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

perform past relevant work, but then described work Plaintiff could perform, which included past relevant work Plaintiff had performed. (Tr. 138-140). The Appeals Council states that the ALJ should: (1) give further consideration to Plaintiff's maximum residual functional capacity, including evaluating all nontreating source opinions and the weight given to each and the appropriate rational with specific references to evidence of record in support of the assessed limitations; (2) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base, with an inclusion of a hypothetical question that reflected the specific capacity and limitations established by the record as a whole; and (3) conduct a new hearing. (Tr. 140-141). Upon remand, on November 8, 2012, a second oral hearing was held, at which Plaintiff and vocational expert Paul Anderson ("VE") testified. (Tr. 75). On January 11, 2013, the ALJ denied Plaintiff's claims for a second time. (Tr. 13). On February 28, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 6). On February 28, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on April 28, 2014. (Doc. 1). On January 27, 2015, Defendant filed an answer and transcript from the SSA

3

proceedings. (Docs. 10 and 11). Plaintiff filed a brief in support of his complaint on March 12, 2015. (Doc. 13). Defendant filed a brief in opposition on May 18, 2015. (Doc. 18). Plaintiff filed a reply brief on May 28, 2015. (Doc. 20).

Plaintiff was born in the United States on July 1, 1986, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 311). Plaintiff graduated from high school in June of 2004, attending special education classes, and can communicate in English. (Tr. 46, 315, 320). His employment records indicate that he previously worked as laborer. (Tr. 368). The records of the SSA reveal that Plaintiff had earnings in the years 2002 and 2005 through 2008. (Tr. 305). His annual earnings range from a low of sixty-seven dollars and nineteen cents ($67.19) in 2002 to a high of seven thousand nine hundred thirty-eight dollars and ninety-three cents ($7,938.93) in 2007. (Tr. 305).

In a document entitled "Function Report - Adult" filed with the SSA on January 26, 2010, Plaintiff indicated that he lived in a house with his family. (Tr. 403). From the time he woke up at two o'clock in the afternoon until he went to

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

bed, Plaintiff would ask his mother to get him something to eat and drink, and watch television until one (1) or two (2) o'clock in the morning.  (Tr. 403). Plaintiff took care of his pets by emptying the litter box and feeding them.  (Tr. 404).  At the time the function report was completed, Plaintiff was able to make his own meals daily, which would take him one (1) hour, and was able to do the laundry sometimes.  (Tr. 405).  When asked to check what activities his illnesses, injuries, or conditions affected, Plaintiff did not check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, memory, understanding, or using hands.  (Tr. 408).  He could walk one (1) mile before needing to rest for fifteen (15) minutes.  (Tr. 408).

Regarding his concentration and memory, Plaintiff needed special reminders to take care of his personal needs, take his medicine, and go places.  (Tr. 404-405). He could count change and handle a savings account, but did not pay his bills because he would "get too frustrated."  (Tr. 406).  He could pay attention for fifteen (15) minutes, was unable to finish what he started, and followed written and spoken instructions "ok," but did not handle stress or changes in routine well. (Tr. 409).

Socially, Plaintiff "hardly ever" left the house because "other people [were] trying to get [him]," and could not drive because "people are dangerous," but

could ride in a car. (Tr. 284). He watched television, played video games, and read, but did not spend time with other. (Tr. 407). He had problems getting along with family, friends, neighbors, and others because he had a mood disorder, Bipolar disorder, an aggressive disorder, and an anxiety disorder, but got along "fine" on a one-to-one basis with authority figures. (Tr. 408-409). He had been fired from a job because people were "talking about [him] and saying he [stunk]" and people were out to get him. (Tr. 409).

At the first oral hearing, which took place on February 17, 2011, Plaintiff testified that he was not working because he "couldn't be around people." (Tr. 47). He lived with his mother, and kept himself occupied by reading, playing video games, using the computer, and watching television. (Tr. 47-49). He helped his mother with laundry, snow removal, lawn care, taking care of the pets, and cooking. (Tr. 51). He left the house about three (3) times a week, with his mother driving, to go to his appointment at Philhaven and to see his father. (Tr. 50). He stated he did not have a driver's license because it was hard for him to go to the Pennsylvania Department of Transportation because of "the amount of people that come in and out." (Tr. 51).

Plaintiff testified that he tried to keep to himself as much as he could because he would become violent. (Tr. 52). He stated that he was home-schooled

6

towards the end of high school because he "couldn't really take being around the students" and left his last job at Wal-mart because he couldn't be around people. (Tr. 58-59). He testified that when he was in a room with more than five (5) people, he would become nervous and anxious and experience panic attacks, which caused shortness of breath and racing thoughts and took a half an hour to an hour to calm down. (Tr. 61-62). His depression caused him to shut himself in his room for weeks to months, during which time he would watch television. (Tr. 62-63). The medications he was taking for his mental health impairments included Ambien, Seroquel, and Depakote, but Plaintiff was not attending therapy because it did not help in the past. (Tr. 54-55). These medications were helping Plaintiff with his depression and the associated symptoms. (Tr. 63). He did not need reminders to take these medications. (Tr. 65).

After the ALJ issued his first decision and the Appeals Council remanded the case back to the ALJ for a second hearing, Plaintiff testified at a second oral hearing on November 8, 2012. (Tr. 74). At the time of this hearing, he was living with his sister, her husband, and their two (2) children. (Tr. 81). However, he did not interact with them, but instead stayed in his room. (Tr. 88). He had been feeling uneasy and was experiencing depression, low energy, crying spells, difficulty sleeping, racing thoughts, difficulty concentrating, decreased appetite,

and feelings of low self-esteem and uselessness because he had been off his medication for two (2) months due to lack of medical insurance. (Tr. 82, 85-87, 89, 91-92). In order to avoid confrontations, he avoided people all together. (Tr. 96).

## MEDICAL RECORDS

On November 15, 2004, Plaintiff had an appointment at Pediatric Clinic for complaints of vomiting, stomach pain, depression, and being picked on and verbally abused at school. (Tr. 443).

On December 7, 2004, Plaintiff again reported to the pediatric clinic due to headaches and difficulty sleeping. (Tr. 442). It was noted that Plaintiff did not like school and that he presented as somewhat depressed with a flat affect. (Tr. 442).

On June 6, 2005, Plaintiff began treatment at Gateway Services for anger issues after making threats to harm his family and after pushing his mother's wheelchair violently. (Tr. 462). His examination revealed: poor hygiene, calm motor behavior; fair eye contact; normal speech; depressed mood and affect; average fund of information; logical and coherent thought processes; limited memory; and poor insight and judgment. (Tr. 467). Plaintiff was diagnosed with anxiety disorder and mood disorder, and his Global Functioning Assessment score

was a fifty (50).  (Tr. 469).

On July 15, 2005, Plaintiff had an appointment at Gateway Services.  (Tr. 490-491).  It was noted that Plaintiff was distant, flat, and angry.  (Tr. 490).

On August 24, 2005, Plaintiff had another appointment at Gateway Services to discuss his treatment plan goals.  (Tr. 457-458).  It was noted that Plaintiff was motivated to finish high school, enjoyed science, was involved in boxing, and was compliant with medication.  (Tr. 458).

On September 2, 16 and 30, 2005, and October 14, 2005, Plaintiff had an appointments at Gateway Services.  (Tr. 474-475).  These appointments were devoid of any notes aside from the medications Plaintiff was prescribed, which included Lexapro and Abilify.  (Tr. 474-475).

On November 18, 2005, Plaintiff had an appointment at Gateway Services.  (Tr. 473).  His exam revealed that he was attentive, polite, involved, and withdrawn.  (Tr. 473).  The medications he was prescribed at that time were Lexapro and Abilify, which caused no negative side effects.  (Tr. 473).

In a letter dated December 13, 2005, that was written by Gateway Services, it was noted that Dr. Gus Kratsa of Gateway diagnosed Plaintiff with Depression, Oppositional Defiant Disorder, and Mood Disorder, and that Plaintiff was being treated by Dr. Kratsa.  (Tr. 528).

On April 7, 2006, Plaintiff had an appointment at Gateway Services. (Tr. 529). His strengths were listed as finishing up his senior year of high school, being compliant with his appointments and medication plan, enjoying science, and attending the YMCA. (Tr. 530). Plaintiff identified his family and school as the source of his anger. (Tr. 529). Plaintiff learned deep breathing and other psychotherapy exercises to help him cope and control his anger. (Tr. 529).

On July 17, 2006, James J. Nolan, Ph.D., performed a mental consultative examination of Plaintiff. (Tr. 553). His exam revealed that he: was alert and oriented; responsive to questions; displayed no psychomotor oddities; was rational, coherent, and relevant; had a shallow fund of information; had intact recent memory; had social judgment that was skewed by suspiciousness; had satisfactory control of his impulses; and described his mood as "fine right now," but appeared mildly depressed with low emotional intensity and mostly bland affect. (Tr. 554). Plaintiff stated that he cried almost every day, had suicidal thoughts, and believed strangers were critical of him, but denied hallucinations or other perceptual disturbances. (Tr. 554). Dr. Nolan diagnosed dysthymic disorder, impulse disorder, not otherwise specified, and parent/child relational problems. (Tr. 554). Dr. Nolan concluded that Plaintiff: had a fair prognosis; could manage his personal funds in a competent manner; could perform his

activities of daily living; was fully capable of performing routine household and yard chores; had underdeveloped relating skills; was quick to retaliate when threatened; was socially insecure; had no restrictions in his ability to understand and remember short, simple instructions; had slight restriction in his ability to carry out short, simple instructions; had moderate restriction in his ability to interact appropriately with supervisors, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting; and had marked restriction in his ability to understand, remember, and carry out detailed instructions and interact appropriately with coworkers. (Tr. 555). In support of these conclusions, Dr. Nolan noted that Plaintiff had difficulties satisfying performance requirements at school and work and had a history of physical aggression. (Tr. 555).

On August 16, 2006, Richard Williams, Ph.D. completed a Mental Residual Functional Capacity form and Psychiatric Review Technique for Plaintiff. (Tr. 557-572). Dr. Williams concluded that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple

work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation. (Tr. 570-71). Dr. Williams opined that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals and make plans independently of others. (Tr. 570-71).

On January 13, 2008, Plaintiff was admitted to Holy Spirit Hospital for punching his younger brother and choking his mother. (Tr. 584). Plaintiff was initially in a 302 commitment by his mother, but delegate Gregory Knox denied the petition (Tr. 584). Therefore, he was admitted voluntarily (Tr. 584). Plaintiff

was cooperative, denied current suicidal thoughts, admitted to daily marijuana use, and denied auditory or visual hallucinations, and admitted to being quick-tempered. (Tr. 584-585). He reported that he had not seen his psychiatrist or taken his medication in over a month, and complained of feeling snappy and angry and experiencing racing thoughts and insomnia. (Tr. 584). Plaintiff's mother informed the psychiatrist that she was fearful of Plaintiff's behavior. (Tr. 584). On examination, Plaintiff: was fairly kempt, oriented and cooperative; had intact memory; had fair concentration; had fairly good eye contact; had coherent and goal-directed speech with no flight of ideas of looseness of associations; had organized thinking; had average intelligence; had a depressed mood and affect; had impaired historical judgment; and had present insight. (Tr. 585). Plaintiff was diagnosed with Bipolar I Disorder, manic phase. (Tr. 584). He was started on Seroquel. (Tr. 584). Plaintiff responded to medication and therapy. (Tr. 589). Upon discharge, Plaintiff's mood stabilized to the point where he was behaving well and had no thoughts of harming others, and had intact memory recall, a bright affect, and clear thinking. (Tr. 589). He was discharged in an improved and stable condition. (Tr. 589).

On December 15, 2008, Raymond S. Klein, ED.D. performed a mental consultative examination of Plaintiff. (Tr. 597). At the time of

the examination, Plaintiff was not taking any medication and was not

in therapy. (Tr. 597). Dr. Klein concluded that Plaintiff could understand and

retain instructions that are not too complex; could sustain attention and do simple,

repetitive tasks; had problems relating to supervisors and others; and had problems

with stress leading to panic attacks. (Tr. 597). Plaintiff's anxiety was mid-range;

his depression was fairly high; and he displayed a tendency to act out as he

had been arrested for assault. (Tr. 597). Plaintiff claimed to hear voices directing

his attention and he stated that he feels that people are out to get him. (Tr. 598).

Plaintiff had trouble with abstract thinking and could not do serial seven's, but

his orientation was appropriate and his recent memory was intact. (Tr. 598).

Dr. Klein concluded that Plaintiff had slight problems remembering; had problems

with decision-making; had mild problems with supervisors and coworkers; and

had many problems with handling the pressures of day-to-day work. (Tr. 598).

He opined that Plaintiff needed therapy and medication, which he was not getting.

(Tr. 598). Dr. Klein completed parts of a mental residual functional capacity

assessment questionnaire. (Tr. 599). He concluded that Plaintiff had slight

restriction in his ability to understand and remember short, simple instructions;

moderate restriction in his ability to make judgments on work-related decisions;

marked restriction in his ability to interact appropriately with supervisors;

14

moderate restriction in his ability to interact appropriately with co-workers;

marked restriction in his ability to respond appropriately to work pressures in a

usual work setting; and moderate restriction in his ability to respond appropriately

to changes in a routine work setting.  (Tr. 599).

On December 24, 2008, Jonathan Rightmyer, Ph.D., completed a mental

residual functional capacity assessment for Plaintiff.  (Tr. 615).  Dr. Rightmyer

concluded that Plaintiff was not significantly limited in his ability to remember

locations and work-like procedures; understand and remember very short and

simple instructions; understand and remember detailed instructions; carry out very

short and simple instructions; perform activities within a schedule, maintain

regular attendance and be punctual within customary tolerances; sustain an

ordinary routine without special supervision; make simple work-related decisions;

complete a normal workday and workweek without interruptions from

psychologically based symptoms and perform at a consistent pace without an

unreasonable number and length of rest periods; ask simple questions and request

assistance; get along with coworkers and peers without distracting them or

exhibiting behavioral extremes; maintain socially appropriate behavior and adhere

to basic standards of neatness or cleanliness; respond appropriately to changes

in the work setting; be aware of normal hazards and take appropriate precautions;

travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 615-16). Dr. Rightmyer concluded that Plaintiff was only moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 615-16). Dr. Rightmyer reviewed and considered Dr. Klein's opinion and determined that Dr. Klein's statements regarding Plaintiff's abilities in the area of making personal and social adjustments were not consistent with all of the medical and non-medical evidence in the file. (Tr. 617). Dr. Rightmyer concluded that Dr. Klein's assessment overestimated Plaintiff's limitations and, therefore, declined to give great weight to that opinion. (Tr. 617).

On May 15, 2009, Plaintiff was admitted to Philhaven Behaviorial Health on a voluntary status for six (6) days after he punched a wall at home and threatened to burn the house down because he was angry that a family member woke him up. (Tr. 679). Plaintiff reported a history of increased depression for several weeks, with mood swings, irritability, increased impulsivity, and poor concentration (Tr. 679). Plaintiff reported burning his arm with a cigarette so that

he would not punch his father.  (Tr. 679).  On examination, Plaintiff: was poorly groomed; displayed concrete thinking; had psychomotor slowing; had a blunted affect; had a depressed mood; was alert and oriented; and displayed no evidence of psychotic symptoms.  (Tr. 680).

On September 2, 2009, Plaintiff had an appointment with Jeremy Walters, M.D. at Philhaven.  (Tr. 632).  Plaintiff had run out of his Celexa and Abilify, and reported that his medications help him to keep his mood level and himself in control.  (Tr. 632).  On examination, Plaintiff was cooperative; made fair eye contact; was alert; did not know the day of the week; had fluent and coherent speech; had goal directed thoughts; was paranoid people would plot against him; and denied suicidal and homicidal ideations.  (Tr. 633).  Dr. Walters opined that Plaintiff needed medication management, stabilization, and structure. (Tr. 633). He noted that Plaintiff had difficulty interacting with others and getting along with other people who trigger him.  (Tr. 633).  Dr. Walters discontinued the Abilify and Celexa, prescribed Seroquel to help with his sleep, anxiety, paranoia and mood disorder, and instructed Plaintiff to return in one month.  (Tr. 634).

On February 5, 2010, Rahat Taswir, M.D., completed a consultative examination of Plaintiff.  (Tr. 646).  Plaintiff had recently been in an altercation with his stepfather, who sustained a concussion.  (Tr. 646).  Plaintiff reported that

he does some jobs under-the-table, but did not feel fit to have a regular job because of his inability to interact and get along with other people (Tr. 648).  On examination, Plaintiff: was marginally groomed; seemed stressed out; made limited eye contact; had limited insight and judgment and impulse control; denied visual, auditory, or tactile hallucinations, but admitted to paranoid thoughts; was alert and oriented; and displayed adequate intelligence, memory, and cognition. (Tr. 649). Dr. Taswir concluded that Plaintiff's ability to understand, remember, and carry out instructions was not affected by his impairments.  (Tr. 643).  He further opined that Plaintiff had a marked limitation in his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting. (Tr. 643).

On March 4, 2010, Michael Suminski, Ph.D. completed a mental residual functional capacity assessment in which he opined that Plaintiff was not significantly limited in most work-related skills, and was only moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation.  (Tr. 652).  Dr. Suminski reviewed and considered Dr.

Taswir's residual functional capacity assessment, but concluded that it was not consistent with the evidence and was an overestimation of the severity of Plaintiff's limitations. (Tr. 653). Dr. Suminski reasoned that Plaintiff's memory was intact; he was socially isolated, but interacted appropriately with medical professionals; he could perform personal care functions; he could sustain an ordinary routine without special supervision; he retained the ability to understand, retain and follow simple routine job instructions; and he had no restrictions in his understanding, memory, and concentration and persistence abilities. (Tr. 654). Accordingly, Dr. Suminski concluded that Plaintiff was able to meet the basic mental demands of simple routine work on a sustained basis despite the limitations resulting from his impairments. (Tr. 654).

On February 27, 2012, Plaintiff was seen at Philhaven for an outpatient evaluation because he was feeling angry, upset, and depressed with an unstable mood. (Tr. 711, 713). Plaintiff reported that he knew he needed treatment, and had been off his medications for many months. (Tr. 711, 713). According to this report, Plaintiff was dismissed from Dr. Walters' care for missing too many appointments. (Tr. 712). On examination, Plaintiff: had a blunt affect; was anxious; was easily irritated; had speech within normal limits; denied any suicidal or homicidal ideation; had cognitive functioning within normal limits; had fair

insight and judgment; and appeared very impulsive.  (Tr. 712-713).  Plaintiff

reported that he was previously on Depakote and Seroquel and that this

combination was working for him.  (Tr. 713).  Plaintiff was diagnosed with

Intermittent Explosive Disorder and Bipolar Disorder, was assigned a GAF of

forty-five (45), was prescribed Depakote and Seroquel, and was instructed to

return in two (2) weeks to start seeing Dr. Nguyen.  (Tr. 714).

On June 12, 2012, Plaintiff stated that nothing had really changed in that he

was not depressed, but felt "stuck."  (Tr. 716).  Plaintiff had run out of medication

a few weeks prior, but had not noted any difference other than more difficulty

dealing with his anger.  (Tr. 716).  Plaintiff was trying to stay away from situations

where angry responses could be triggered and, therefore, was spending most of his

time in isolation.  (Tr. 716).  Plaintiff was poorly groomed; dressed appropriately;

was initially guarded but he relaxed somewhat as the interview progressed;

displayed unremarkable speech; had a depressed mood; had a glum and restricted

affect; had a logical and goal directed thought process; and appeared hopeless and

resigned.  (Tr. 716).  He was instructed to return in one (1) month.  (Tr. 716).

On August 3, 2012, Plaintiff had an appointment at Philhaven.  (Tr. 715).

He reported that his moods were less extreme and he was better able to control his

agitation recently, which he attributed to medication and to the recent decrease in

his stress at home due to his mother and brother moving out. (Tr. 715).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured ("DLI") of September 30, 2012. (Tr. 23). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity as of his alleged onset date of July 1, 2004. (Tr. 18).

At step two, the ALJ determined that Plaintiff suffered from the severe[7]

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other

impairment of the following: "bipolar disorder; depression; and anxiety (20 C.F.R.

404.1520© and 416.920(c))."  (Tr. 19).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  (Tr. 19).

At step four, the ALJ determined that Plaintiff had the RFC  to perform a

full range of work at all exertional levels with exceptions.  (Tr. 22).  Specifically,

the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform a full range of
> work at all exertional levels but with the following non-
> exertional limitations: [Plaintiff] is limited to occupations
> involving only simple work-related instructions; only simple
> work-related judgments; no interactions with members of the
> public or with coworkers; although [Plaintiff] can be in the
> same environment with other coworkers, he is not expected to
> work as part of a team; only occasional interaction with
> supervisors; only occasional changes to the routine work
> setting; and attention and concentration is reduced to 90
> percent.

(Tr. 22).

---

evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's
ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, he was unable to perform past relevant work, but that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  (Tr. 28-30).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between July 1, 2004, the alleged onset date, and the date of the ALJ's decision on January 11, 2013.  (Tr. 30).

## **DISCUSSION**

On appeal, Plaintiff asserts the following arguments: (1) the ALJ failed to comply with the Appeals Council remand order from July 27, 2012; (2) the ALJ erred in finding that Plaintiff did not meet Listings 12.04 or 12.06 or Child Listing 112.04; (3) the ALJ failed to properly evaluate Plaintiff's consulting physicians; (4) the ALJ erred in his credibility assessment; (5) the ALJ failed to provide a clear and supported RFC; and (6) the ALJ erred by not making specific findings as to Plaintiff's ability to perform basic work-related activities as required by SSR 85-15.  (Doc. 13, pp. 11-33).  Defendant disputes these contentions.  (Doc. 18, pp. 26-41).

1.    **Appeals Council Remand Order**

On July 27, 2012, the Appeals Council remanded the case to the ALJ for

three reasons: (1) the decision did not articulate the weight given to the opinions

of three (3) physicians; (2) the decision did not address the evidence of the

Plaintiff's mother's third party function report; and (3) the vocational expert

testified that Plaintiff could not perform past relevant work, but then described

work Plaintiff could perform, which included past relevant work Plaintiff had

performed.  (Tr. 138-140).  The Appeals Council stated that the ALJ should: (1)

give further consideration to Plaintiff's maximum residual functional capacity,

including evaluating all non-treating source opinions and the weight given to each

and the appropriate rational with specific references to evidence of record in

support of the assessed limitations; (2) obtain supplemental evidence from a

vocational expert to clarify the effect of the assessed limitations on Plaintiff's

occupational base, with an inclusion of a hypothetical question that reflected the

specific capacity and limitations established by the record as a whole; and (3)

conduct a new hearing.  (Tr. 140-141).

Plaintiff asserts that the ALJ did not comply with this order because he did

not obtain testimony from the VE as to the effect the limitations would have on his

occupational base.  (Doc. 13, pp. 12-13).  However, in reviewing the transcript

28

from the second oral hearing, it is clear that the ALJ complied with the Order.

During the second oral hearing, the following questions were asked by the ALJ

and Plaintiff's attorney and answered by the VE:

> Q:  Okay.  Thank you.  Well, I'll ask you then to assume a
> hypothetical individual who is 26 years old and who has
> a high school education.  And assume further please this
> hypothetical individual has no exertional limitations.
> However, this hypothetical individual is limited to
> occupations involving only simple work related
> instructions, only simple work related judgments, only
> occasional interaction with co-workers and supervisors.
> No interaction with the public.  Only occasional changes
> to the routine work setting.  And let's assume this
> hypothetical individual has attention and concentration
> reduced to 90 percent of the workday.  Now --
>
> A:  Attention and concentration reduced?
>
> Q:  To 90 percent, so it's reduced by 10 percent to 90.  If I
> were to find that warehouse work was past relevant work
> could that person perform warehouse work?
>
> A:  Yes, Your Honor.
>
> Q:  However if I were to find that that was not past relevant
> work would there by any occupations in the national or
> the regional economies that this hypothetical individual I
> described would be able to perform?
>
> A:  There would be, Your Honor.
>
> Q:  What would those occupations be?
>
> A:  One would include a janitor or a sexton, for example,

that exists at a church.  The DOT code of 389.667-010, medium, unskilled, SVP of 2.  625 local labor market, 3800 several regions, 95,000 nationally.

Another would be cleaner[/]housekeeping, DOT code 323.687-014, light, unskilled, SVP of 2.  Numbers 1221 local labor market, 5230 several regions.

Q:      5330?

A:      5230.

Q:      Thank you.

A:      149, nationally.  Another would be bakery worker[/]conveyor line, DOT code 524.687-022, 416 local labor market, 2300 several regions, 57,000 nationally, light, unskilled, SVP of 2.

Q:      Now if that person was also limited to no interaction with co-workers and not expected to be, to work as part of a team, would there by any occupations that that hypothetical individual could perform?

A:      Would this individual therefore be interpreted as living exclusively alone, working exclusively alone?

Q:      No.  This person would work in an environment where there might be other co-workers but there would be no interaction and no teamwork.

A:      I would think the three positions I noted would essentially meet those criteria –

Q:      Okay.

A:      - - with the exception of housekeeper where there might

30

be a 10 to 15 percent reduction in the number.

ALJ:  Okay.  Mr. Scholl, what questions would you like to ask Dr. Anderson?

ATTY: Just a few questions.

BY THE ATTORNEY:

Q:    If someone is off task for, and completely off task, for more than 20 percent of the workday due to psychiatric symptoms would he be able to engage in substantial gainful activity?

A:    No, Counselor, no competitive employment.

Q:    And what's the most percentage wise that someone could be off task during the course of the workday and still engage in SGA [substantial gainful activity]?

A:    I think around the 10 to 15 percent level.

ATTY: Okay.  And if someone has - - is limited to unskilled work and has psychiatric disorders that makes him unable to respond appropriately to pressures in a usual work setting, and unable at all to interact appropriately with co-workers because of anger problems and propensity towards violence in the past, would they be able to engage in SGA?

ALJ:  Now that was unable to respond appropriately to what?

ATTY: To interactions with co-workers, public and supervisors?

ALJ:  Yeah, now you had said no interactions, or unable to interact with co-workers and public, and you've already taken care of that - -

31

ATTY: Right.

ALJ:  - - in the RFC, but there was something about responding appropriately - -

ATTY: To pressure in a usual work setting.

ALJ:  Pressures in the usual work setting?

BY THE ATTORNEY:

Q:    If someone's unable at all to respond to pressure in a usual work setting, would they be able to engage in substantial gainful activity?

A:    No, no competitive employment.

...................................................................................................

BY THE ADMINISTRATIVE LAW JUDGE

Q:    What are pressures in a usual work setting, Dr. Anderson?

A:    With all work there is a degree of stress that at least is minimal.  And if somebody's not able to handle that or the pressures that come from performing any work activity at all, there would be no competitive employment.

Q:    So are you saying there's no job in which there is no pressure?

A:    That's correct.

...................................................................................................

BY THE ATTORNEY

Q:      Would playing a game of computer chess, the amount of
        pressure you would deal with doing that, would that be
        equal to or greater than the amount, the minimal amount
        of pressure you'd face in an eight hour workday?

A:      I would say with respect to performing simple, unskilled
        jobs where there's little change and little expectations for
        productivity that the computer activities would be more
        stressful.

(Tr. 103-108).  Thus, the clarification that was required by the Appeals Council

remand order was obtained during the second oral hearing because the ALJ

obtained supplemental evidence from a vocational expert at the second hearing

that clarified the effect of the assessed limitations on Plaintiff's occupational base,

with an inclusion of a hypothetical question that reflected the specific capacity and

limitations established by the record as a whole.

        Plaintiff also contends that being off task for ten percent (10%) of the work

day would mean that he would not be able to sustain work in an eight hour a day,

five day competitive work week in violation of the "regular and continuing" work

week described by Social Security Regulation ("SSR") 96-8p.  (Doc. 13, p. 12).

Plaintiff states:

        Specifically, a 10 percent reduction in the ability to work 8
        hours a day is representative of being slightly over 7 hours a
        day.  This is not regular and continuous as defined by the

> Commissioner.  See SSR 96-8p.  As the ALJ is not a vocational
> expert, he should have elicited testimony from the vocational
> expert regarding the conflict with the Regulations.  By not
> doing so, the ALJ did not comply with the AC remand order.

(Doc. 13, p. 12).

However, as long as an administrative law judge's hypothetical includes all

of a Plaintiff's limitations as supported by the record, the testimony of a vocational

expert in response to a hypothetical constitutes substantial evidence for purposes

of judicial review.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

Furthermore, contrary to Plaintiff's assertion that the VE should have explained

any alleged conflict with SSR 96-8p, Plaintiff has not provided, nor has this Court

found, any case law in support of this argument.  Rather, a vocational expert need

only explain any discrepancies between his or her testimony and the Dictionary of

Occupational Titles.[8]  As such, because the ALJ relied on the VE's testimony

---

8. The administrative law judge has a duty to develop the record and flesh out any

inconsistencies.  Social Security Regulation 00-4p states:

> Occupational evidence provided by a [VE] generally should be
> consistent with the occupational information supplied by the
> DOT. When there is an apparent unresolved conflict between
> [VE] evidence and the DOT, the adjudicator must elicit a
> reasonable explanation for the conflict before relying on the
> [VE] evidence to support a determination or decision about
> whether the claimant is disabled. At the hearings level, as part
> of the adjudicator's duty to fully develop the record, the

regarding the reduction in attention and concentration and because there is no support for the argument involving the alleged conflict with SSR 96-8p, remand based on these assertions is not warranted.

## 2.    Adult Listings 12.04 and 12.06 and Child Listing 112.04

Plaintiff contends that the ALJ erred in failing to find that Plaintiff met Adult Listings 12.04 and 12.06[9] because he met these Listings paragraph "B" criteria, arguing he had marked limitations in social functioning and concentration, persistence, or pace. (Doc. 13, pp. 13-19).

A claimant bears the burden of showing that her impairment meets or equals a listed impairment, and that he is thus presumptively disabled. Burnett v. Comm. of Soc. Sec., 220 F.3d 112, 120 n.2 (citing Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)). A plaintiff must meet all of the specified requirements of a

---

adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p.

9. Plaintiff also argues that the ALJ erred in finding that his impairments did not meet Listing 112.04. SSR 112.00, Mental Disorders, states, "A. Introduction: The structure of the mental disorders listings for children under age 18 parallels the structure for the mental disorders listings for adults but is modified to reflect the presentation of mental disorders in children." Because Plaintiff was eighteen (18) at the time of his alleged onset date, the ALJ was under no obligation to take this Listing into account.

Listing in order to be considered presumptively disabled.  Sullivan v. Zebley, 493

U.S. 521, 532 (1990); 20 C.F.R. § 404.1525(a); 20 C.F.R. pt. 404, subpt. P, app. 1.

Listing 12.04, Affective Disorders, consists of paragraph A criteria that

involves a set of medical findings, paragraph B criteria that involves a set of

impairment-related functional limitations, and paragraph C criteria that involves a

set of additional functional limitations.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

12.00(A).  The required level of severity for Listing 12.04 is met when "the

requirements in both A and B are satisfied, or when the requirements in C are

satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Paragraph "B" of Listing

12.04 requires two (2) of the following: (1) marked restriction of activities of daily

living; (2) marked difficulties in maintaining social functioning; (3) marked

difficulties in maintaining concentration, persistence or pace; or (4) repeated

episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt.

P, App. 1, §§ 12.04(B), 12.06(B).  Listing 12.04 paragraph "C" requires

demonstration of a medically documented history of a chronic affective disorder of

at least two (2) years duration that has caused more than a minimal limitation of

ability to do basic work activities, with symptoms or signs currently

attenuated by medical or psychosocial support, and one (1) of the following: (1)

repeated and extended episodes of decompensation; (2) a residual disease process

that has resulted in such marginal adjustment that even a minimal increase in

mental demands or change in the environment would be predicted to cause the

individual to decompensate; or (3) a current history of one (1) or more years'

inability to function outside a highly supportive living arrangement, with an

indication of continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P,

App. 1, § 12.04(C)(1)-(3).

Listing 12.06, Anxiety Disorders, provides as follows:

A. Medically documented findings of at least one of the
following:

1. Generalized persistent anxiety accompanied by
three out of four of the following signs or
symptoms:

a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object,
activity, or situation which results in a compelling
desire to avoid the dreaded object, activity, or
situation; or

3. Recurrent severe panic attacks manifested by a
sudden unpredictable onset of intense
apprehension, fear, terror and sense of impending
doom occurring on the average of at least once a

week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.06.  A claimant meets

Listing 12.06 when the requirements of both A and B are satisfied, or when the

requirements of both A and C are satisfied.

In his decision, the ALJ stated that while Plaintiff did meet criteria "A" of these Listings, Plaintiff's mental health impairments did not meet the aforementioned paragraph "B" criteria. (Tr. 20). In terms of activities of daily living, the ALJ noted that Plaintiff had moderate restrictions. (Tr. 20). He relied on the following opinions, as explained in the decision: (1) Dr. Nolan and Dr. Klein noted that Plaintiff helped his mother, and while he lacked motivation to perform household chores, he was fully capable of doing so; and (2) Dr. Rightmyer and Dr. Suminski "observed that [Plaintiff] could perform personal care functions to maintain an acceptable level of personal hygiene and his activities of daily living appeared adequate for simple routine tasks." (Tr. 20).

In terms of social functioning, the ALJ stated that Plaintiff had moderate difficulties in this area. (Tr. 20). The ALJ explained that Plaintiff's teacher described as a very "likable" student lacking in behavioral problems and pleasant to have in class, and that Plaintiff socialized with friends. (Tr. 20). He noted that: (1) Dr. Nolan indicated Plaintiff had a marked limitation to interact appropriately with supervisors and only a slight limitation to interact appropriately with the public; (2) Dr. Klein indicated Plaintiff had a marked limitation in interacting appropriately with supervisors, a moderate restriction interacting appropriately with coworkers, and no restriction pertaining to public interaction; (3) Dr. Taswir

39

indicated that Plaintiff had marked restrictions in his ability to act appropriately with the public, supervisors, and coworkers, but that this opinion appeared to be based on self-reported symptoms; (4) Dr. Suminski noted that Dr. Taswir's statements regarding Plaintiff's social functioning abilities were not consistent with the medical and non-medical evidence and were an overestimate of the severity of Plaintiff's social functioning limitations; and (5) Dr. Rightmyer and Dr. Suminski noted that, although socially isolated, Plaintiff behaved appropriately with medical professionals and, despite an assault history, had friends and "performed simple routine tasks in low social demand settings." (Tr. 20-21). The ALJ also noted that Plaintiff was never fired due to aggressive behavior. On these rationalizations, the ALJ concluded that Plaintiff had moderate difficulties in social functioning "because he tends to isolate himself and has difficulty interacting with family members; however, the difficulties do not rise to the level of marked because [Plaintiff] can interact appropriately." (Tr. 21).

With regard to concentration, persistence or pace, the ALJ found that Plaintiff had moderate difficulties. He stated the following:

> Dr. Nolan observed that [Plaintiff] would probably persist at a reasonable pace in pursuits that appealed to him (Exhibit 7F). Dr. Nolan determined that [Plaintiff] had no limitation to understand and remember short simple instructions and only slight limitation to carry out simple instructions (Exhibit 7F).

Dr. Nolan determined that [Plaintiff] had moderate limitation in responding appropriately to work pressures in a usual work setting and changes in a routine work setting (Exhibit 7F). [Plaintiff] stated that he could handle his own funds (Exhibit 12F). Dr. Klein noted slight limitation in understanding and remembering short, simple instructions and moderate limitation making judgments on simple work-related decisions (Exhibit 12F). Dr. Klein indicated marked limitations to respond appropriately to work pressures in a usual work setting and moderate limitation to respond appropriately to changes in a routine work setting (Exhibit 12F). Dr. Klein also noted that [Plaintiff] had limited skills, which limited opportunities (Exhibit 12F). Dr. Rigthmyer considered the opinion of Dr. Klein, an examining source, and found that Dr. Klein's statements regarding [Plaintiff's] abilities in the area of making personal and social adjustments were not consistent with all of the medical and non-medical evidence in the claims folder (Exhibit 14F). Dr. Rightmyer stated that the evidence provided by Dr. Klein revealed only a snapshot of [Plaintiff's] functioning and was an overestimate of the severity of his limitations and, therefore, great weight cannot be given to Dr. Klein's opinion (Exhibit 14F). Dr. Rightmyer stated that the psychologist's opinion was without substantial support from other evidence of record, which rendered it less persuasive (Exhibit 14F). The undersigned agrees, based on Dr. Rightmyer's specialization and review of the entire record.

Dr. Taswir determined that [Plaintiff's] ability to understand, remember, and carry out instructions was not affected by his impairment, but he had marked limitation to respond appropriately to work pressures in a usual work setting and changes in a routine work setting (Exhibit 19F). However, the undersigned finds that these findings are inconsistent with his GAF of 50-60, indicated moderate symptoms and an impairment that does not affect his ability to understand, remember, and carry [out] instructions (Exhibit 20F). There is evidence of a learning disability while a student (Exhibit 6F).

> Drs. Rightmyer and Suminski noted that [Plaintiff's] basis memory processes were intact and he could follow instructions (Exhibits 14F and 21F). He could sustain an ordinary routine without special supervision and retained the ability to understand, remember, and carry out simple job instructions, with no restrictions in regards to understanding, memory, and sustaining concentration and persistence (Exhibit 21F). Drs. Rightmyer and Suminski concluded that [Plaintiff] was able to meet the basic mental demands of simple routine work on a sustained basis despite the limitations resulting from his impairments (Exhibits 14F and 21F). Therefore, the undersigned finds that [Plaintiff's] difficulties in this area, while not the level of marked, rise to moderate.

(Tr. 21-22).

As for episodes of decompensation, the ALJ determined that Plaintiff had experienced none that had been of extended duration. (Tr. 22). As such, the ALJ determined that because Plaintiff's mental health impairments did not cause at least two (2) marked limitations combined or one (1) marked limitation coupled with an extended episode of decompensation, Plaintiff did not meet criteria "B" of Listings 12.04 or 12.06. (Tr. 22).

Lastly, the ALJ determined that Plaintiff did not meet his burden of proving the paragraph "C" criteria.[10] (Tr. 22). As such, the ALJ determined that Plaintiff was not presumptively disabled for any Listings at step three of the sequential

---

10. It is noted that Plaintiff did not argue that he met the criteria for paragraph "C" and therefore this Court will not address the ALJ's decision in relation to paragraph "C."

evaluation process.  (Tr. 20-22).

This Court again notes the standard of review when reviewing an appeal for denial of DIB and SSI, which is that if substantial evidence supports the ALJ's decision, it must be upheld.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Upon review of the record and Plaintiff's assertion that he had marked limitations in social functioning and concentration, persistence or pace, it is determined that the ALJ properly analyzed Plaintiff's mental health impairments

43

in relation to the requirements of Listings 12.04 and 12.06, and rendered an

opinion that is supported by substantial evidence as explained by the ALJ, and

discussed above, at length.  (Tr. 20-22).  Thus, the ALJ's determination that

Plaintiff's mental health impairments did not meet the requirements of Listings

12.04 or 12.06 will not be disturbed on appeal.

### 3.   ALJ's Analysis of the Consulting Physicians

Plaintiff contends that the ALJ erred in assigning only some weight to the

consultative examiners, namely Drs. Nolan, Klein, and Taswir.  (Tr. 19-23).  More

specifically, Plaintiff argues that the ALJ's assignment of weight to these opinions

is "improperly conclusory and essentially engages in cherry picking the opinions

in question."  (Tr. 22).  Plaintiff argues that "[t]he ALJ cannot reach a conclusion

first and then attempt to justify it by ignoring competent medical evidence in the

record that suggests the opposite result as is the case here but ignoring multiple

opinions for marked limitations which would result in a finding of [Plaintiff's]

disability."  (Tr. 22).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion."). If a "treating source's opinion on the

issue(s) of the nature and severity of [Plaintiff's] impairment(s) is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [Plaintiff's] case record, [the

Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527( c)(2) and

416.927( c)(2).

    However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961

(3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's

RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one (1) medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008). However, the ALJ cannot base the rejection of a treating physician's opinion based on "his or her own credibility judgments, speculation or lay opinion." Morales, 225 F.3d at 317-18.

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

With regards to the medical opinion evidence, the ALJ gave only some weight to the opinion of Dr. Taswir because his determination that Plaintiff had marked limitations in interaction with others appeared to be based on Plaintiff's self-reported symptoms and overestimates of his limitations as they were not

consistent with Dr. Taswir's examination and moderate findings, including a GAF

of fifty (50) to sixty (60).  (Tr. 26).  The ALJ also gave only some weight to the

opinion of Dr. Nolan because, although he opined that Plaintiff had marked

limitations in his ability to interact appropriately with coworkers, he also noted

that Plaintiff would probably persist at a reasonable pace in pursuits that appealed

to him.  (Tr. 26).  The ALJ gave some weight to the opinion of Dr. Klein that

Plaintiff had marked limitations in his abilities to interact appropriately with

supervisors and to respond appropriately to work pressures because, in examining

this opinion, Dr. Rightmyer considered this opinion to be inconsistent with all of

the medical and non-medical evidence of the record and to be only a "snapshot of

[Plaintiff's] function and was an overestimate of the severity of his limitations."

(Tr. 26).

          The ALJ gave great weight to the opinions of Dr. Williams, Dr. Rightmyer

and Dr. Suminski, who "reviewed the file at the State agency level and determined

that [Plaintiff] retained the ability to meet the basic mental demands of simple

routine work on a sustained basis despite the limitations resulting from his

impairments (Exhibits 8F, 9F, 13F, 14F, 21F, and 22F).  The opinions are

consistent, and State agency medical and psychological consultants are highly

qualified physicians and psychologists who are experts in the evaluation of the

medical issues in disability claims under the Act (SSR 96-6p)." (Tr. 26).

This Court again reiterates the standard of review when reviewing an appeal for denial of DIB and SSI, which is that if substantial evidence supports the ALJ's decision, it must be upheld. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

First and foremost, Dr. Taswir, Dr. Nolan, and Dr. Klein were all consultative examiners, not treating physicians, and thus the ALJ was under no duty to give these opinions controlling weight. 20 C.F.R. § 404.1527(c); 404.1502

(a treating source means your own physician has provided you with medical treatment that has been ongoing); see also Sykes v. Apfel, 228 F.3d 259, 266 n. 7 (3d Cir. 2000) (an examining physician's opinion that the claimant had a disabling psychiatric impairment was not entitled to controlling weight because the physician was not a treating physician).   Instead, as discussed, the ALJ had a duty to weigh the medical opinions, and given adequate explanations as to the weight assigned to the opinions.  20 C.F.R. § 416.927(c).

Upon review of the record and the ALJ's analysis of the medical opinions as to Plaintiff's limitations, it is determined that this analysis and the weight given to the opinions by the ALJ are supported by substantial evidence because the ALJ complied with the requirement to adequately explain the evidence to which he afforded lesser weight, and provided an explanation sufficient enough to permit the court to conduct a meaningful review.   (Tr. 25-28); see Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009); In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).   Thus, the weight the ALJ assigned to  the aforementioned opinions is an aspect of the ALJ's decision that will not be disturbed on appeal.

### 4.   **Credibility Assessment**

Plaintiff contends that the ALJ "dismisses" Plaintiff's credibility in violation of SSR 96-7p because he did not provide an adequate rationale, but instead mischaracterized the medical evidence.  (Doc. 13, pp. 23-27).  More specifically, Plaintiff argues that the ALJ: (1) erred in discrediting Plaintiff on the basis that the "objective medical evidence [did] not support the severity alleged" because the record supported Plaintiff's severe mental health impairments and provided "ample support for" Plaintiff's subjective complaints; (2) the ALJ's finding that Plaintiff did well on medication was vague and did not "automatically indicate that [he] lacked symptoms or limitations;" (3) the ALJ erred in relying on Plaintiff's non-compliance with treatment in assessing his credibility because it was documented that Plaintiff had poor insight and failed to note that Plaintiff did not have medical insurance; and (4) the ALJ erred in questioning the credibility of Plaintiff's mother's third party function report "without providing a single legitimate reason."  (Doc. 13, pp. 24-27).  Plaintiff concludes stating that, "In conclusion, the ALJ failed to provide clear and convincing reasoning as to why he rejected [Plaintiff's] credibility.  Clearly, the ALJ relied upon mischaracterizations of [Plaintiff's] ability to find him able to work."  (Id. at 27).

"[A]n ALJ's findings based on the credibility of the applicant are to be

accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Frazier v. Apfel, 2000 WL 288246 (E.D. Pa. 2000) (citing Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997)); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."). The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. First, symptoms, such as pain, shortness of breath, fatigue, etcetera, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment that results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. § 404.1529(b). In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. § 404.1529(b). Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements:

> In general, the extent to which an individual's statements about
> symptoms can be relied upon as probative evidence in
> determining whether the individual is disabled depends on the
> credibility of the statements.  In basic terms, the credibility of
> an individual's statements about pain or other symptoms and
> their functional effects is the degree to which the statements
> can be believed and accepted as true.  When evaluating the
> credibility of an individual's statements, the adjudicator must
> consider the entire case record and give specific reasons for the
> weight given to the individual's statements.

SSR 96-7p.

The ALJ discussed all evidence relating to Plaintiff's medically determinable impairments and the symptoms Plaintiff alleged these impairments caused.  (Tr. 23-25).  Ultimately, based on review of Plaintiff's subjective complaints and the medical evidence of record, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects were not entirely credible.  (Tr. 24).  In arriving at this credibility determination, the ALJ discussed the fact that Plaintiff's voluntary psychiatric hospitalization in January of 2008 noted that he was fairly kempt in appearance, oriented in three (3) spheres, was cooperative, demonstrated intact recent and remote memory, and had fair concentration, good eye contact, coherent and goal-directed speech with no flight of ideas or looseness of associations, organized thought, average intelligence, and fair arithmetic skills, and was observed to do well on medication.  (Tr. 24, 585).

The ALJ also noted that Plaintiff was assigned a GAF of fifty-five (55) by Dr. Walters in September 2009 and of fifty-five (55) to sixty (60) by Dr. Taswir in February 2010. (Tr. 25, 634). The ALJ noted that both state agency physicians declared Plaintiff to be capable of meeting the basic mental demands of work, and Plaintiff himself stated that his medications helped his symptoms. (Tr. 26-27, 695).

By evaluating the extent to which Plaintiff's subjective complaints were reasonably consistent with the objective medical evidence, the credibility analysis was proper. See Blue Ridge Erectors v. Occupational Safety & Health Review Com'n, 261 Fed. Appx. 408, 410 (3d Cir. 2008) (quoting St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) ("[T]he ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable.")). While Plaintiff argues that the ALJ erred in his credibility analysis because he failed to discuss several medical opinions that allegedly supported a finding of Plaintiff being more than not entirely credible, it is well-established that the ALJ need not address every piece of evidence in the record. Hur v. Barnhart, 94 Fed. Appx. 130, 133 (3d Cir. 2004); see Johnson v. Commissioner of Social Sec., 529 F.3d 198, 204 (3d Cir. 2004) (An ALJ may not reject pertinent evidence without explanation, but does not need to cite all

53

evidence the claimant presents). As such, the ALJ's credibility analysis is supported by substantial evidence and will not be disturbed on appeal.

### 5.   Residual Functional Capacity Assessment

Plaintiff asserts that, in the RFC, the ALJ incorrectly determined that Plaintiff's attention and concentration should be reduced to ninety percent (90%) of the workday, and that instead this limitation should have been reduced by more than ten percent (10%). (Doc. 13, pp. 29-30). He attempts to support this argument with the fact that the state agency physicians noted that he had moderate limitations in maintaining his attention and concentration and that the ALJ's credibility assessment was flawed. (Id.). Plaintiff concludes this argument stating, "Had the ALJ properly analyzed [Plaintiff's] testimony and credited this testimony, his ability to maintain attention and concentration would have been further reduced." (Id. at 30).

However, Plaintiff's argument is unpersuasive and unsupported. First and foremost, Plaintiff himself testified at his oral hearing that he had only a "little bit" of difficulty with concentration. (Tr. 89). In his Function Report, when asked to check what activities his illnesses, injuries, or conditions affected, Plaintiff did not check memory or understanding. (Tr. 408). Furthermore, both state agency physicians opined that Plaintiff was capable of working on a sustained basis, Dr.

Suminski opined that Plaintiff had no restrictions in concentration and persistence, and Dr. Rightmyer concluded that Plaintiff had only moderate limitations in his ability to maintain attention and concentration for extended periods. (Tr. 615, 617, 654). As explained by the United States Court of Appeals for the Third Circuit, "moderately limited" does not mean that a plaintiff's ability to perform an activity is "unacceptable in the national workforce." Smith v. Commissioner of Social Security, 631 F.3d 632, 636-37 (3d Cir. 2010) (quoting POMS DI 24510.063(B)(2)). Plaintiff also testified that he was able to play video games and computer chess, which, according to the VE, were activities considered to be more stressful than the jobs he testified Plaintiff could perform. (Tr. 108). As such, substantial evidence supports the ALJ's decision to reduce Plaintiff's attention and concentration by only ten percent (10%), and the ALJ's RFC determination will not be disturbed on appeal.

### 6.   **Step Five Finding**

Plaintiff asserts that he is "mentally unable to perform the occupations of janitor/ sexton; cleaner/ housekeeper and bakery worker, conveyor line at the unskilled occupational base" because, pursuant to SSR 85-15, his depression, bipolar disorder, and anxiety preclude him from meeting the basic mental demands of unskilled work. He notes that Dr. Nolan opined that Plaintiff had marked

impairment in his ability to interact appropriately with co-workers, that Dr. Klein opined that he had marked limitations in his ability to interact appropriately with supervisors and respond appropriately to work pressures in a usual work setting, and that Dr. Taswir opined that he had marked restriction in his ability to interact appropriately with the public, supervisors, and co-workers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (Doc. 13, p. 31). Plaintiff contends that these opinions support his argument that he is "precluded from unskilled work because he cannot meet the basic requirements of even unskilled work as defined in [SSR] 85-15." (Id.).

He also asserts that the ALJ erred in failing to ask the VE whether Plaintiff could perform the identified occupations in light of marked limitations in interacting with the public, supervisors, and co-workers, and in his ability to respond appropriately to work pressures and to changes in a routine work setting. (Id. at 32). Because of these alleged errors, Plaintiff concludes that remand is necessary. (Id. at 33).

The basic mental demands of competitive, unskilled, remunerative work include the abilities, on a sustained basis, to understand, carry out, and remember simple instructions; to deal with changes in a routine work setting; and to respond

appropriately to supervision, co-workers, and usual work situations.  SSR 85-15.

"A substantial loss to meet any of these basic work-related activities would

severely limit the potential occupational base."  Id.  "This, in turn, would justify a

finding of disability because even favorable age, education, or work experience

will not offset such a severely limited occupational base."  Id.

As discussed, substantial evidence supports the great weight the ALJ gave

to the opinions of Dr. Williams, Dr. Rightmyer and Dr. Suminski, who "reviewed

the file at the State agency level and determined that [Plaintiff] retained the ability

to meet the basic mental demands of simple routine work on a sustained basis

despite the limitations resulting from his impairments (Exhibits 8F, 9F, 13F, 14F,

21F, and 22F).  The opinions are consistent, and State agency medical and

psychological consultants are highly qualified physicians and psychologists who

are experts in the evaluation of the medical issues in disability claims under the

Act (SSR 96-6p)."  (Tr. 26).  Furthermore, only limitations that the ALJ finds to be

credible are to be included in the ALJ's RFC assessment.  Salles v. Commissioner

of Social Security, 229 F. App'x 140, 147 (3d Cir. 2007).  In the case at hand, the

ALJ gave great weight to the limitations as opined by Dr. Williams, Dr.

Rightmyer, and Dr. Suminski, which was that Plaintiff retained the ability to meet

the requirements of SSR 85-15.  (Tr. 26).  As such, the ALJ had no duty to present

any greater limitations as opined by Dr. Nolan, Dr. Klein, and Dr. Taswir, and this determination will not be disturbed on appeal.

## **CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied, and the decision of the Commissioner will be affirmed.

A separate Order will be issued.

**Date**: February 17, 2016

/s/ **William J. Nealon**
**United States District Judge**

58